FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUL 17 2008  ★

BROOKLYN OFFICE

Ronald A. Nimkoff (RN 4598)
NIMKOFF ROSENFELD & SCHECHTER, LLP
Attorneys for Plaintiff
One Pennsylvania Plaza, Suite 2424
New York, New York 10119
(212) 868-8100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

RONALD A NIMKOFF,

                        Plaintiff,                      08 Civ. ____  2856

        - against -

                                                        COMPLAINT  SPATT, J.

ERIC J. DOLLHAUSEN, DOMENICK P.
OREFICE, OFFICER GALLAGHER,  ROBERT L. NASH,            PLAINTIFF
SERGEANT MOLINELLI, UNKNOWN POLICE                     DEMANDS A
OFFICERS IDENTIFIED AS JOHN DOE NUMBERS 1-10,          TRIAL BY JURY
COUNTY OF NASSAU,  NEW YORK,
                                                        WALL, M.J

                        Defendants.

-------------------------------------------------------------------x

Plaintiff Ronald A. Nimkoff ("Mr. Nimkoff"), by and through his attorneys

Nimkoff Rosenfeld & Schechter, LLP, complains against Defendants Eric J. Dollhausen,

Domenick P. Orefice, Officer Gallagher, Robert L. Nash, Sergeant Molinelli, Unknown

Police Officers Identified as "John Doe Numbers 1-10," and the County of Nassau, New

York.

**JURISDICTION AND VENUE**

1.      This action is commenced pursuant to 42 U.S.C. § 1983 and the jurisdiction

of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.  Mr. Nimkoff further invokes

the pendent jurisdiction of this Court to hear and decide claims arising under state law.

2.     Venue is placed in this district pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims set forth in this complaint occurred in this district.

## PARTIES

3.     Mr. Nimkoff is a citizen of the United States, a resident of the State of New York, and of the Town of Syossett, and an attorney, admitted to the practice of law in the State of New York.

4.     On information and belief, defendant Eric J. Dollhausen ("Dollhausen") was, at all times pertinent to the averments of this complaint, a police officer in the employed by the Nassau County Police Department. He is sued individually and in his official capacity.

5.     On information and belief, defendant Domenick P. Orefice ("Orefice") was, at all times pertinent to the averments of this complaint, a police officer employed by the Nassau County Police Department. He is sued individually and in his official capacity.

6.     On information and belief, defendant Officer Gallagher ("Gallagher") was at all times pertinent to the averments of this complaint a police officer employed by the Nassau County Police Department. He is sued individually and in his official capacity.

7.     On information and belief, defendant Sergeant Molinelli ("Molinelli") was, at all times pertinent to the averments of this complaint, a police sergeant employed by the Nassau County Police Department. He is sued individually and in his official capacity.

-2-

8.     On information and belief, defendant Robert L. Nash ("Nash") was, at all times pertinent to the averments in this complaint, a police lieutenant employed by the Nassau County Police Department. He is sued individually and in his official capacity.

9.     On information and belief, defendants John Doe Numbers 1-10 (individually identified as "Defendant John Doe No. 1," "Defendant John Doe No. 2," etc.) were, at all times pertinent to the averments in this complaint, police officers employed by the Nassau County Police Department. They are sued individually and in their official capacities.

10.     Defendant County of Nassau was, at all times pertinent to the averments of this complaint, the entity employing and training the other defendants and maintaining the Nassau County Police Department.

11.     At all times pertinent to the averments of this Complaint and in connection with all actions of Dollhausen, Orefice, Gallagher, Molinelli, Nash, and John Doe numbers 1 - 10 (collectively, the "individual defendants") alleged in the complaint, the individual defendants were acting under color of law and pursuant to their authority as police officers of the County of Nassau.

## FACTUAL BACKGROUND

12.     During the morning of July 18, 2007, Mr. Nimkoff received a telephone call from his girlfriend, Robin Koscheka ("Ms. Koscheka"), who resides at 12 Laura Lane, Plainview, New York – – about seven minutes away by car from Mr. Nimkoff's Syosset residence. Ms. Koscheka frantically requested that he assist her in removing the

water from her flooded basement. It had rained very heavily the night before, and many houses and roads in Nassau County were flooded. Mr. Nimkoff, accordingly, drove at once to Ms. Koscheka's house, stopping on the way only for gas.

13.     When he arrived at Ms. Koscheka's house, Mr. Nimkoff found her basement to be seriously flooded. He attempted to remedy the situation, at first, with a wet-dry vacuum cleaner, and then, upon realizing how fruitless that endeavor was, and would be, returned back home so he could get the dozens of towels that he had there. When he returned to Ms. Koscheka's house with the dozens of towels in hand, he found Ms. Koscheka using a wet-dry vacuum cleaner and towels in an attempt to deal with the flooding. Mr. Nimkoff proceeded to mop the basement with towels while Ms. Koscheka vacuumed the downstairs carpeting.

14.     During all this time, while both Mr. Nimkoff and Ms. Koscheka were slaving away in the flooded basement, Ms. Koscheka's 18 year old daughter, Brooke (with whom Ms. Koscheka was regularly experiencing behavioral issues), also was present in Ms. Koscheka's house. Upon realizing that Brooke was in the house, but not helping with the flooded basement, Ms. Koscheka walked upstairs to ask Brooke for her help. After Brooke refused to help, Ms. Koscheka informed Brooke that she was a member of the family and household and so was required to help deal with the flood condition. When Brooke repeated her refusal, Ms. Koscheka told her that if she were not going to act like a member of the household, she should not be there. So, Ms. Koscheka asked Brooke to leave the house, but Brooke refused to do that either.

-4-

15.     On information and belief, Ms. Koscheka was frustrated by her daughter's disobedience and lack of cooperation in a time of crisis. With the hope of teaching Brooke a lesson, Ms. Koscheka, after further discussion, then asked Mr. Nimkoff to dial the police so that she could ask a police officer to escort Brooke from her house. Mr. Nimkoff did as Ms. Koscheka requested and handed the telephone to Ms. Koscheka as it was ringing. When the police answered, Ms. Koscheka informed them that her 18 year old daughter was directed to leave her house, but refused. Ms. Koscheka requested that they send someone over to escort Brooke from the premises. After hanging up the telephone, Ms. Koscheka opened the front door and waited for the police. Mr. Nimkoff returned to the basement to resume mopping.

16.     Dollhausen and Orefice responded to the call. Orefice responded first. When Mr. Nimkoff came up from the basement after another twenty minutes or so of mopping, he saw Ms. Koscheka talking to Orefice in the driveway. Orefice then entered the house, together with Ms. Koscheka. While standing in the foyer of the house, Ms. Koscheka explained to Orefice that Brooke was eighteen years old and that she, the owner of the house, had told Brooke to leave. Ms. Koscheka asked the officer to escort her out of the house. Orefice refused to do so, maintaining that since Brooke lived there, Ms. Koscheka would have to commence a civil eviction proceeding to remove her. Mr. Nimkoff politely interjected that this was not the law, that Brooke was a licensee, not a tenant, and that she could be escorted from the house without a court order, but Orefice remained firm in his refusal to do so.

17.    At that point, Ms. Koscheka, after seeking legal advice from Mr. Nimkoff

in his capacity as her attorney, asked Orefice to leave her house, but Orefice refused,

saying to Ms. Koscheka, with reference to Mr. Nimkoff, "What are you listening to him

for?" or words to that effect.  When Ms. Koscheka replied that Mr. Nimkoff was her

lawyer and repeated her request to Orefice to leave, he again refused, stating, "You called

me and I am not leaving."

18.    Orefice then walked upstairs to the bedroom portion of the

house and found Brooke in her bedroom.  He proceeded to interrogate her.  Orefice's

interrogation of Brooke, which was audible to Mr. Nimkoff, seemed directed at getting

the daughter to say that Mr. Nimkoff was abusive to her and to her mother.  Orefice said,

referring to Mr. Nimkoff, "He physically abuses you, right?"  When Brooke answered in

the negative, Orefice continued,  "Well, he is verbally abusive to you, right"?  Brooke

replied, "No."  Orefice then said to Brooke, "He is physically abusive to your mother,

though, right?" and Brooke again responded in the negative.

19.    Thereafter, Orefice emerged from Brooke's room and was then joined by

Dollhausen.  Orefice said to Ms. Koscheka, pointing at Mr. Nimkoff,  "He is abusive to

you, isn't he?" or words to that effect.  Ms. Koscheka replied, in words or substance, "No,

he is wonderful, he rushed over this morning to help me with my flooded basement."

Ms. Koscheka then again told the officers to leave her house, but they again ignored her.

Orefice then asked Ms. Koscheka another question, but, after consulting again with Mr.

Nimkoff, Ms. Koscheka declined to answer.  At that point, Dollhausen said to Ms.

-6-

Koscheka, referring to Mr. Nimkoff, "You don't have to listen to him, he's nobody," or words to that effect. Ms. Koscheka replied, "He's my lawyer."

20.     Upon hearing Ms. Koscheka's response, Dollhausen thrust his face directly into Mr. Nimkoff's face in a menacing manner, causing Mr. Nimkoff to back up in fear. Mr. Nimkoff called 911 and to the 911 operator voiced his fears of the two "rogue" police officers who were threatening him. Mr. Nimkoff asked the 911 operator to keep the telephone line open for his protection, but she said that she could not keep the line open or connect Mr. Nimkoff to the local police precinct as he then requested. The 911 operator told Mr. Nimkoff that a supervisor was on the way to Ms. Koscheka's house. She gave Mr. Nimkoff the number of that precinct, which Mr. Nimkoff then called, similarly asking them to keep the line open, but to no avail.

21.     After hanging up with the precinct, the situation appeared to have calmed and the officers had gone back into Brooke's room. As a result, Mr. Nimkoff and Ms. Koscheka then started walking down the stairs to the basement to resume bailing out the water. As they were walking, Mr. Nimkoff draped his arm around Ms. Koscheka's shoulders to comfort her.

22.     As they were walking down the stairs, Dollhausen appeared at the top of the stairs and again demanded of Ms. Koscheka that she answer their questions. Mr. Nimkoff audibly advised Ms. Koscheka as her attorney not to say anything, wagging his index finger and cautioning, "Not another word." At that point, Dollhausen came charging down the stairs at Mr. Nimkoff, shouting that he was under arrest. Upon reaching Mr.

Nimkoff, Dollhausen grabbed his arms, forced them behind Mr. Nimkoff's back, and

handcuffed him. He muscled Mr. Nimkoff, who was attired only in floppy shorts, a

t-shirt, and flip-flops, up the stairs and out into the street. As he was being manhandled,

Mr. Nimkoff, fearing for his safety and hoping to attract witnesses in an effort to ensure

his safety, repeatedly screamed, "Help!" as loudly as he could.

23.     Dollhausen then pushed the handcuffed Mr. Nimkoff up against his police

car and frisked him, removing a cordless house telephone from his pocket. When

Dollhausen then began questioning him, and Mr. Nimkoff replied that he wanted to speak

to his lawyer, Dollhausen, told Mr. Nimkoff, "If you don't cooperate, I will hurt you."

24.     Dollhausen then placed Mr. Nimkoff in the back seat of the patrol car

with all of the windows closed, despite the oppressive summer heat. Mr. Nimkoff

remained there under those conditions for approximately 20-25 minutes. When Mr.

Nimkoff requested of Dollhausen that he open a window, since it was so hot in the car,

Dollhausen refused and began tapping mockingly on the car window. The supervisor,

who, on information and belief, was Molinelli, then arrived. Mr. Nimkoff informed

Molinelli that it was much too hot in the car and that it would be cruel to keep a dog in

the conditions to which he was being subjected. The supervisor then gave instructions

that a window be opened, so either Dollhausen or Orefice then "cracked" the driver's side

front window, but when Mr. Nimkoff, seated in the backseat on the passenger's side,

requested permission to slide closer to the open window (on the driver's side), the officers

refused to let him do so.

25.     When Dollhausen and Orefice at last drove Mr. Nimkoff to the

precinct house, they taunted him in the car, saying, "We've got Mr. Lawyer, we've got

Mr. Counselor, we've got Mr. Esquire, he doesn't look so tough to me," or words to that

effect.

26.     Upon arriving at the precinct house, Mr. Nimkoff was taken to the desk

officer, an older man who, on information and belief, was Nash. He told Nash that he

was afraid of Dollhausen and Orefice, and wanted to deal with different officers. The

desk officer told him he would be "alright." Dollhausen and Orefice walked Mr. Nimkoff

down the hallway and into a room with a small cell. The cell was occupied by another

inmate, addressed by the officers as "Gary," and who so identified himself. Within the

cell, which itself was kept locked, Mr. Nimkoff's handcuffs were removed from his left

wrist so that his right wrist could be handcuffed above his head to the wall, which it was.

"Gary," by contrast, was not handcuffed. Mr. Nimkoff remained in that position for

approximately six hours, except for a little over a minute when he was finally allowed to

go to the bathroom (*see* ¶ 29 below) and for a couple of minutes while he was being

photographed and fingerprinted.

27.     During the time that Mr. Nimkoff was handcuffed to the wall, he repeatedly

requested water but Dollhausen, Orefice and Gallagher, among others, refused and

ignored his request. Mr. Nimkoff was thirsty and dehydrated from working in the flooded

basement, sitting in the hot patrol car, and from the stress and exertion of his arrest. At

one point, Gallagher was handed a bottle of water by another officer. He drank it in Mr.

Nimkoff's presence, taunting him by exclaiming, "Ahhhh, this water is so refreshing" and other words to that effect. Mr. Nimkoff was, in fact, never given any food, water or other drink at any time while he was imprisoned in the police station.

28.    While in custody, Mr. Nimkoff made repeated requests to use the telephone to call his attorney and Ms. Koscheka, but Dollhausen, Orefice, Gallagher and the others refused to let Mr. Nimkoff make any telephone calls – not even the proverbial "one telephone call" to which detainees are supposedly entitled.

29.    At one point during his confinement in the locked cell, while his right wrist was handcuffed above his head to the wall, Mr. Nimkoff needed to urinate and requested to be able to go to the bathroom. His request was ignored for more than an hour during which time Mr. Nimkoff crossed his legs and did everything he could do to stop from urinating in the jail cell. He was petrified as to what the officers might do to him if he urinated in the cell. Finally, Dollhausen escorted Mr. Nimkoff down the hall to the bathroom where he kept the bathroom door open so that he could watch Mr. Nimkoff excrete.

30.    At another point during his confinement, one of the officers, John Doe Number 1, in Mr. Nimkoff's presence, instructed Orefice to shred certain documents in Mr. Nimkoff's police file. Mr. Nimkoff asked the officer not to shred any documents that might be material evidence. John Doe Number 1 just laughed and said, "You can request anything you want." Orefice and other officers from among John Doe numbers 1-10 repeatedly advised Mr. Nimkoff that they were going to shred documents from Mr.

-10-

Nimkoff's file, each time with derision and a grandiose display, singing and humming, "I am going to shred documents now, I am going to shred the material evidence," and other words to that effect.

31. After being handcuffed to the wall for more than six hours, John Doe Number 2 told Mr. Nimkoff that he was being released. He asked Mr. Nimkoff whether he felt healthy. Mr. Nimkoff replied in the negative, saying that he felt queasy and light-headed from dehydration and that his wrists were sore and hurt from the handcuffs. Mr. Nimkoff also suffered from sore shoulders and arms from being handcuffed to the wall. Mr. Nimkoff was immediately told that, in light of his answer, he would not be released, but would be taken instead to the hospital. Another prisoner, when subsequently asked in Mr. Nimkoff's presence if he felt healthy, replied in the affirmative and was told exuberantly, "See that's the right answer and so, you get to leave."

32. Mr. Nimkoff then was uncuffed from the wall and again handcuffed behind his back. Dollhausen and Orefice drove him to the hospital. At the hospital, Mr. Nimkoff complained that his wrists were hurting – they both had red welts from the handcuffs. In response, Dollhausen examined Mr. Nimkoff's wrists and said, "These handcuffs are much too loose." He then tightened them.

33. At the hospital, Mr. Nimkoff was first interviewed by a nurse, who identified herself as "Christine." Christine sought to elicit Mr. Nimkoff's medical history. Mr. Nimkoff elected not to divulge his medical history in front of Dollhausen and Orefice, but they forcefully indicated that they were not leaving his side. Shortly

-11-

thereafter, Mr. Nimkoff was ushered into a curtained bed space where he met a doctor. When the doctor inquired of Mr. Nimkoff as to his condition, Mr. Nimkoff again indicated that he had privacy rights and did not want to discuss his medical condition or history in front of the officers. Dollhausen and Orefice at this point said, "We're not going anywhere," but, at the doctor's suggestion, they allowed Mr. Nimkoff, still handcuffed, to go behind a curtain with the doctor. Behind the curtain, Mr. Nimkoff told the doctor that he felt dehydrated, queasy, and light-headed. The doctor asked Mr. Nimkoff if he wanted some water and brought him two small plastic cups of water, which Mr. Nimkoff gratefully drank. Dollhausen and Orefice then ushered Mr. Nimkoff away from the curtained bed space telling him that it was needed "for someone more important than you."

34.    Mr. Nimkoff was returned from the hospital to the precinct house without treatment and again handcuffed to the wall within the locked cell. An hour or so later, he was given a so-called "desk appearance ticket," charging him with obstructing governmental administration in violation of section 195.05 of New York's Penal Law and was released from custody. Before exiting the station house, Mr. Nimkoff, who had been arrested without wallet, money, or cell phone, asked to be able to make a telephone call so that he could secure a ride, but his request was refused, so he simply walked out of the precinct house with nothing more than the clothes on his back.

35.    Shortly thereafter, the District Attorney for the County of Nassau dropped the charge asserted against Mr. Nimkoff through the desk appearance ticket issued to him.

-12-

36.    On or about October 10, 2007, Mr. Nimkoff served a notice of claim on the County of Nassau, based upon the events complained of herein.

37.    On January 10, 2008, Mr. Nimkoff was deposed by the County of Nassau and the Nassau County Police Department pursuant to Section 50-H of the General Municipal Law.  The deposition began and was concluded that day.

## COUNT I

38.    Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 37 hereof as if fully set forth herein.

39.    By committing a false arrest and imprisonment of his person in that he had not by means of intimidation, physical force or interference, or by means of any independently unlawful act, or by means of or interfering with any telecommunication system prevented or attempted to prevent a public servant from performing an official function, as required for there to be a violation of Penal Law Section 195.05, defendants violated Mr. Nimkoff's lawful rights and are thereby liable to him under 42 U.S.C. § 1983.

40.    Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for compensatory damages in an amount excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT II

41.    Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 40 hereof as if fully set forth herein.

-13-

42.     By their unnecessarily cruel and unlawful treatment of Mr. Nimkoff in,
among other things, forcing him into and keeping him in a police car with the windows
closed on a hot July day, and keeping him in custody for hours handcuffed, with his arm
above his head, to a wall within a locked jail cell and refusing to let him go to the
bathroom when he needed to go, defendants violated Mr. Nimkoff's rights under the
Fourth and Fourteenth Amendments to the Constitution of the United States, and thereby
are liable to him under 42 U.S.C. § 1983.

43.     Accordingly, defendants are, jointly and severally liable to Mr. Nimkoff for
compensatory damages in an amount excess of $1 million and for punitive damages in an
amount in excess of $5 million.

## COUNT III

44.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 43 hereof
as if fully set forth herein.

45.     By depriving Mr. Nimkoff of his right to counsel, defendants violated his
rights under the Sixth and Fourteenth Amendments to the Constitution of the United
States, and are thereby liable to him under 42 U.S.C. § 1983.

46.     Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for
compensatory damages in an amount in excess of $1 million and for punitive damages in
an amount in excess of $5 million.

## COUNT IV

47.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 46 hereof as if fully set forth herein.

48.     Mr. Nimkoff had a legitimate expectation of privacy in Ms. Koscheka's house, where he frequently stayed and kept possessions.

49.     By remaining in Ms. Koscheka's house after they were told to leave, Dollhausen and Orefice violated Mr. Nimkoff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and thus are liable to him under 42 U.S.C. § 1983.

50.     Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT V

51.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 50 hereof as if fully set forth herein.

52.     By failing to supervise properly, thereby ratifying and condoning violations of Mr. Nimkoff's constitutional rights, Molinelli and Nash are liable to Mr. Nimkoff under 42 U.S.C. § 1983.

53.     Accordingly, defendants Molinelli and Nash are jointly and severally liable to Mr. Nimkoff for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT VI

54.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 53 hereof as if fully set forth herein.

55.     By willfully destroying records of Mr. Nimkoff's arrest and imprisonment, defendants engaged in conspiracy to conceal the facts of that arrest and obstruct the administration of justice, and are thereby liable to Mr. Nimkoff under 42 U.S.C. § 1983.

56.     Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for compensatory damages, in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT VII

57.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 56 hereof as if fully set forth herein.

58.     The actions of the defendants, all committed under color of law, evinced a conspiracy with one another to violate the Mr. Nimkoff's constitutional rights, rendering them jointly and severally liable to Mr. Nimkoff under 42 U.S.C. § 1983.

59.     Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT VIII

60.     Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 59 hereof as if fully set forth herein.

61.    The actions of the individual defendants, all committed under color of law, evinced a policy and standard of police behavior condoned and perpetuated by the County of Nassau through its police department that was violative of the rights of Mr. Nimkoff, rendering it liable to Mr. Nimkoff under 42 U.S.C. § 1983.

62.    Accordingly, the County of Nassau is liable to Mr. Nimkoff for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

## COUNT IX

63.    Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 62 hereof as if fully set forth herein.

64.    Dollhausen and Orefice committed a wrongful arrest and imprisonment of Mr. Nimkoff under the laws of the State of New York.

65.    Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for compensatory damages in an amount in excess of $1 million and for punitive damages in excess of $5 million.

## COUNT X

66.    Mr. Nimkoff repeats and reavers the averments of paragraphs 1 - 65 hereof as if fully set forth herein.

67.    Dollhausen and Orefice committed an assault and battery upon Mr. Nimkoff under the laws of the State of New York.

68.    Accordingly, defendants are jointly and severally liable to Mr. Nimkoff for

-17-

compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million.

WHEREFORE, Mr. Nimkoff demands a trial by jury and judgment:

(1) on the first count against defendants jointly and severally for compensatory damages in an amount excess of $1 million and for punitive damages in an amount in excess of $5 million;

(2) on the second count against defendants jointly and severally for compensatory damages in an amount excess of $1 million and for punitive damages in an amount in excess of $5 million;

(3) on the third count against defendants jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

(4) on the fourth count against defendants jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

(5) on the fifth count against defendants Molinelli and Nash jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

(6) on the sixth count against defendants jointly and severally for compensatory damages, in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

-18-

(7) on the seventh count against defendants jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

(8) on the eight count against the County of Nassau for compensatory damages in an amount in excess of $1 million and punitive damages in an amount in excess of $5 million;

(9) on the ninth count against defendants jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in excess of $5 million;

(10) on the tenth count against defendants jointly and severally for compensatory damages in an amount in excess of $1 million and for punitive damages in an amount in excess of $5 million;

(11) awarding to him a sum representing the value of the legal services rendered in connection with the prosecution of this action, together with a sum representing the costs incurred in connection with the prosecution of this action; and

(12) awarding to him such other and further relief as this Court deems to be just and equitable.

July 16, 2008

NIMKOFF ROSENFELD
& SCHECHTER, LLP

By:_____
Ronald A. Nimkoff (RN 4598)
Attorneys for Plaintiff
One Pennsylvania Plaza, Suite 2424
New York, New York 10119
(212) 868-8100

-20-